I suspect our visitors already know this, but the reason that the defendant is always the appellant in these cases, challenging the verdict, is because if there was a verdict in favor of the defendant, the government has no recourse. There can't be a second trial once the jury has acquitted a defendant of a crime under the double jeopardy claim of our Constitution. The United States v. White involves some of the implications of one of the most famous Supreme Court decisions, Miranda v. Arizona. You may have even heard about that. I don't know how much American crime stories are on Albanian TV or in the movies that you get there, but under the Miranda decision, if a person is arrested, then the officer must give certain warnings to the defendant that you don't have to answer any questions. You have the right to remain silent. If you do speak, anything you say can and will be used against you. You have a right to an attorney before we question you. If you can't afford an attorney, an attorney will be provided to you. And after that, the Supreme Court decided that one of the implications of these warnings is to tell the defendant that if you don't speak, your silence can't be used against you. Here we have a slightly different situation where the defendant did speak to some extent and then said, I don't want to answer any more questions. And the question is, before us, is whether it was improper for the government to put on the fact that the defendant didn't say certain things when questioned by the officers, whether that can be used against the defendant at trial. So that's what we've got to decide in this case with the help of counsel. Ms. Leah Yaffe for Appellant Eddie White. At Mr. White's trial, the last thing the government told the jury is that if Mr. White's duress defense, quote, was the truth, there is zero, no downside to telling Detective Miller that. And he didn't tell Detective Miller that because he didn't know what the evidence was at the crime scene at the time. This argument followed the government's repeated questioning of Detective Miller and its case in chief as to whether, for example, the detective gave Mr. White, quote, an opportunity to tell you what happened that might exclude him from being involved, might justify something he did. All he's got to do is tell you and you'll investigate, correct? And it also followed the government's repeated questioning of Mr. White during cross as to whether the detective gave him the opportunity, quote, several times to tell him what happened. In other words, the government repeatedly tried to discredit Mr. White's duress defense by drawing attention to the fact that he did not share it with the police upon arrest. And that was a plain error under... Is there a difference between commenting on silence and commenting on omissions from a story? So what the Supreme Court has said is you are allowed to comment on prior inconsistent statements, which might include an omission technically. But what you can't do is comment on something that the defendant just didn't tell to the police. And so the way to look at this is what were the questions that the government asked and what was the arguments that the government made designed to do? Were they pointing out prior inconsistent statements or a technical omission? Or were they saying, hey, it's a little bit suspicious that this exculpatory defense is being shared for the first time at trial? And here it's plain that it's the latter of those things. We know this, the very last thing, I know I just said it, the very last thing that the government says to the jury is, here's why it's meaningful that he didn't say this to Detective Miller when he was arrested. It's meaningful because it allowed him to see the government's evidence and fabricate a story. That's drawing meaning from silence. It's not talking about a prior inconsistent statement. Do you think that the record on that is ambiguous at all? I guess I'm wondering if you think you have a plainness problem. I don't, Your Honor. Here I think what we know from Mr. White's interrogation is that he had an incident five months before the charging incident in this case. He was particularly scared of those people. He's equivocal about this point, but he thinks maybe they were there on May 8th. But he was so scared on May 8th that he defecated on himself and that he was running away from someone who was shooting at him and he needed to duck. So those statements the government was permitted to argue could have influences towards their story of what happened on May 8th. They also can support Mr. White's direct defense about what happened on May 8th. And talking about those statements was permissible. The government was permitted to ask about it, but what they couldn't do and what's plainly not part of the interrogation is say, there's this whole exploratory defense that you're sharing for the first time. Isn't that meaningful? And what are the cases that constitute your law on plainness here? Assuming there's not persuasive value to this invocation argument. We have Doyle. What else have you got? I think the Supreme Court case in Anderson v. Charles, which lays out this test of look at the design of the questions, draw meaning from silence, that's not okay. Is this about a prior and consistent statement? That's okay. And then this court's adoption of that standard from Anderson v. Charles in United States v. Canterbury, where they said, look, we understand the defendant made some statements in this case, but the specific questions that are being challenged in the Canterbury appeal, those went to the silence. Those went to draw meaning from silence. But Canterbury seems different, doesn't it? I mean, Canterbury is unlike our case, isn't it? Because there the defendant made only three short statements to police. We have a much, what I see as a more ambiguous record here. And we've got cases like May and Pemberton. Help me out. So I think that there's an important difference here between verbosity and comprehensiveness. So yes, Mr. White spoke for a longer amount of time than Mr. Canterbury appears to have from that decision. But what he spoke about didn't provide us any information and any kind of detail about what happened on May 8th, what was relevant to his duress defense or to the government's alternative theory of this shootout. So the reason this case is more like Canterbury and not like May or Twyman is because in those cases you have a defendant saying, for example, in United States v. May, yes, I committed this drug conspiracy. I gave this person this money to go buy cocaine at that bar. I stored her cocaine in my house in order to have collateral for the debt that she owed me. And then just for the first time at trial says, oh, but one important detail is I tried to get out of it the day before. Here we don't have that. We don't have a description from Mr. White about what happened on May 8th. We don't even have him admit to possessing the Glock pistol, which he eventually does at trial. Well, he says he's not going to talk about the gun, but then he talks about the gun. He does not talk about the Glock pistol in the interrogation, Your Honor. What he does is at most— So he has to talk about the firearm, the charged firearm? I don't think there's a technical rule like that, Your Honor. What I'm trying to suggest or to explain is we don't know what happened from Mr. White's statement at the post-arrest interrogation. He doesn't admit or deny having the Glock pistol. And I think more importantly, he doesn't explain the circumstances leading up to his ultimate possession of the Glock pistol on that day. There are statements he makes that I think you can draw inferences and the jury could draw inferences in favor of the government or in favor of Mr. White. But the problem is for the government that we don't know just based on the post-arrest interrogation video alone what happened on May 8th in any kind of detail. When we learn that is through Mr. White's duress testimony or from the government's perspective through their introduction of evidence at trial, but we don't learn it from the post-arrest. How could we be thinking about the fact that your client told Detective Miller that he's shared 90% of everything? Sure. I think what's important here is to look at how that was treated in the trial below, which literally nobody took that seriously. So Mr. White, during his interrogation, he says something like that a few times. The first time he says, I've told you to start to finish what happened. And Detective Miller says, no, this is what I would need to know if I were going to investigate this and asks him a series of questions. And Mr. White immediately backtracks and says, no, I don't have the answers to that. I'm not going to incriminate myself and I'm not going to incriminate anyone else. The difficult issue here is deciding what's our test. And even though it's an unpublished opinion, Pemberton does indicate what the test is. In that case, the defendant, when he came to the trial, says he had a knife and that's why I was shooting in self-defense. And I think this sentence kind of captures it. Defendant's statements contain a sufficient – the statements at the time of arrest contain a sufficient level of detail suggesting that he would have mentioned a knife in the hands of the victim. And by that test, did your client say enough at the time of the arrest that you'd expect him to have mentioned this? And isn't that the case here? Wouldn't you have expected him when they're – because that would not implicate some – he wouldn't be snitching on someone to give this. So two points, Your Honor, to begin with. First, we do know the test and it's from Charles and Canterbury, which are Supreme Court and then a published 10th Circuit decision. And the test is what were – what was the design of what the government did here? Were they drawing meaning from silence? And if they were, that's improper. To distinguish from Pemberton's facts. Well, if Pemberton's drawing an inference from silence, it is. The question is, is it – is whether the question – whether the argument made by the prosecutor is that this is inconsistent with what was said before. And what Pemberton suggests is the very fact that you spoke in some detail before suggests that you would have included that element if it were true. So it's inconsistent with your prior full statement to be silent about this. And how is – I don't think I disagree with your read of Pemberton, Your Honor. I think I disagree with the implication on this case. So let's look at what the government says themselves in closing arguments. They say, he wouldn't really tell any of the specifics to Detective Miller. What we know is there was this incident from New Year's Eve, and what we're inferring is that this May 8th shootout happened. The government never claims that he has shared a comprehensive story, anything like what Mr. Pemberton did there, where he admitted – the actus reus – he admitted killing the person, said it was self-defense, said the person was verbally abusive, and just left out the detail of the knife. I think that's very different than what we have here. And it's important, what the government argues in closing, I think is really important to this question, because they're exploiting the lack of a comprehensive story here. This isn't my gloss on it. The government's primary, or one of their primary pushbacks on the duress testimony is to say, he waited until trial, and where he could see the government's evidence, so he could fabricate an entire story around the evidence. And that only has salience to the jury if the government also says, he didn't tell any specifics, he waited, he was pretty silent. What happened here is the government making the plain point to the jury that there's a lot of information we did not learn from the post-arrest interrogation. We think our version of the story is better, but don't take our word for it. Let's look at what Mr. White did. What Mr. White did was not tell Detective Miller that he was innocent when he had the opportunity to tell him that he was innocent, and that is a powerful, a very powerful argument to be part of it. It sets it up in the case in chief. It includes it in cross-examination of Mr. White, and then it leans into this, the very last thing they say to the jury before deliberation. I think that's meaningful here. It's a really, really powerful idea. It's a really unfair one, and it's a really unconstitutional one, and that's what happened to Mr. White. I don't think it's anything like the Pemberton case, where the self-defense story and the admission of the crime had already happened in the post-arrest interrogation. But do you think that Pemberton suggests that there's... That's where I am. Oh, I'm sorry. Go ahead. No, go ahead. Okay. Do you think that Pemberton helps at all? I mean, I'm trying to understand this case under the rubric of the plein air standard, and so you're right. Pemberton is an unpublished case, but it has some factual similarities here, and it's certainly drawing on precedent, and it was resolved on plainness, right? I think Pemberton is a good example of the type of issue that Your Honor was asking in your first question about what does an admission look like under the Charles test, and here we have a fairly comprehensive, here being the Pemberton case, a fairly comprehensive explanation. I did kill this person. I did it because of self-defense. We were drinking. He was very verbally abusive to me. He's not remaining silent about what happened. He's not... There's this new detail, which is treated as an inconsistent admission, I think, perhaps correctly in Pemberton. We don't have that kind of like, here's the story. Here's what happened. I basically told you... I told you that there was a shootout, but now I'm telling you that there's a carjacking. There's no... Was it internally inconsistent? Do you think that your client's interview was internally inconsistent? No, Your Honor. I think there were statements that Mr. White made that could have multiple different inferences, and he had the opportunity to explain what he meant on the stand, and the government had the opportunity and took it to question him about, isn't this more likely to support the shootout theory than your carjacking defense? And all that's fine. We haven't challenged it on this appeal. All we've challenged are the plain instances in which the government was talking totally devoid of any specific statement that Mr. White made in the interrogation. If you look what he's doing and what the government's doing in the case-in-chief and the direct examination of Detective Miller, they're just playing the interrogation video and they're pausing it and they're saying, is that an opportunity where he could have said something? Yes? No? If he had said something, would you have investigated it? All he had to do was tell you, right? Then he would have investigated it over and over and over. It's not part of a colloquy like we see in Charles that was getting towards an omission. Let me interrupt. I want to hear from Judge Ebel, definitely. But when... When White was being interrogated by the officer who tried to get more details, he said that he had told virtually the whole story. He did say, I told you everything. Yes, sir. Isn't that contrary to what you're arguing now? If he said he told the whole story and he left out something vital to his defense, then isn't that an inconsistency? So I think there's two parts of that question, if I'm understanding that correctly. The first is, was Mr. White partially silenced in this case despite making that statement? I think unquestionably yes, and it's how both Detective Miller and the trial prosecutor understood him. And looking at that statement in context, we have Detective Miller, you know, pushing back on a similar statement a few minutes earlier, saying this is the type of information I would need to know and it never gets shared with him in the interrogation. Could the government ask specifically about the 90 to 95 percent question? Sure, and I think that they did. We haven't challenged that part of the record. What we've challenged is separately them saying totally unrelated to that statement, which they are not leaning on as any sort of proof that he was in fact comprehensive. Totally separate from that statement, we have the government repeatedly making the point that this duress defense was not shared with Detective Miller, and drawing a conclusion for the jury, that's because he fabricated it. And that's just the most quintessential type of Doyle error you can have, is you have an exculpatory defense, we didn't hear anything about the exculpatory defense. Well, I'm trying to figure out exactly when the defendant relied on his right to be silent and when he was saying I'm not going to testify because I don't want to be a snitch. When did the defendant clearly, I mean at the very end, I think he said I'm not going to testify further, and later, not during the examination, but later he said I had the feeling that I was being trapped, but his feelings later don't control this case for me. What controls is when he asserted the right for silence at the time. Can you tell me when he clearly asserted his silence was because of Miranda rights, not because of not wanting to be a snitch? Yes, Your Honor. Two points, if I may. First, it's our position very strongly that he did not have to expressly invoke his Miranda warnings, and I can get into that in a minute. He did not have to expressly invoke his right to remain silent in order to claim Doyle error. I can explain that further. I know I'm low on time, but to get to Your Honor's specific question, our position is in the alternative. If you were to find that he needed to expressly invoke, which I think would be inconsistent with Supreme Court precedent, when he says to Detective Miller about seven minutes in, I'm not going to say whether I had a firearm or not, and Detective Miller respects that. And then about 17 minutes in, when Detective Miller gives him a list of questions of things he would want to know if he were going to investigate, you know, a potential story that Mr. White would have, Mr. White says I don't have those answers, I'm not going to incriminate myself, and I'm not going to incriminate anyone else. So those, I think, are two limited invocations of his right to remain silent about whether he committed the conduct he's charged with and what were the circumstances leading up to it. But again, I think the Supreme Court has been very clear that the invocation doctrine is for claims arising out of the Fifth Amendment self-incrimination clause and not for claims arising out of the due process clause. In fact, in Doyle, they specifically say we don't need to look at whether they're actually relying on their Miranda rights or not. It's insolubly, it's insolubly ambiguous whether they are, and that's enough for it to be fundamentally unfair. I know I'm out of time. Thank you, Your Honors. Good morning, and may it please the Court. Brendan Gantz for the United States. Quote, I just told you from start to finish why I'm here. Mr. White said that to Detective Miller during his 46-minute long post-arrest interview. He also said, quote, I told you what happened. At trial, however, Mr. White presented a duress defense premised on the notion that he actually had not told Detective Miller what happened at all. In fact, one of the few specific things about the events of that day that Mr. White claimed to have discussed with Detective Miller was his decision to pick up the Glock, which he claimed he was referring to when he told Detective Miller he would not let anyone shoot him again, even if it meant going to prison. Now Mr. White contends for the first time on appeal that he was relying on his Miranda rights to remain partially silent as to whether he possessed a gun on May 8th, even as he also argues that the jury was entitled to believe his testimony that he discussed that specific subject with Detective Miller. In reply, he clarifies that his argument is that a defendant who discusses a topic and even discusses it in, quote, some detail, unquote, can later assert that he was partially silent as to the same topic. That argument is directly contrary to the Supreme Court's decision in Anderson, which makes clear that once a defendant decides to speak as to the subject matter of his statements, he has not remained silent at all. More broadly, Mr. White's position is contrary to both the law and the factual record in this case, and on plenary review, this court should affirm for three reasons. First, the law is clear that once a defendant waives his Miranda rights and tells a version of his story to the police, Doyle does not apply except, quote, to the extent that a defendant clearly relies on a Miranda warning to refuse to answer specific questions. How does that square with Canterbury, where we didn't consider a threshold inquiry? Well, Canterbury doesn't discuss the question of invocation, and for that reason, we would submit it's simply not relevant to the question of invocation, for the most part. Well, it doesn't help your position, but how do we reconcile it with your position? Well, so, Your Honor, we would, to take a step back from Canterbury for just a moment, and then I'll return to it, we would submit the Doyle Doctrine and the Fifth Amendment Doctrine are distinct, but they are closely related, because Doyle protects a defendant's silence only to the extent that it's induced by Miranda warnings. Now, in determining whether Doyle applies, we would suggest that the analysis should proceed in two steps. First, if a defendant is silent, as in Doyle or the Brecht case they cite, or his statements are tantamount to silence, as in Doyle itself, then Doyle applies because that silence is insolubly ambiguous. But once a defendant decides to speak, as Anderson makes clear, a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent, and thus, Doyle does not apply. And as this Court pointed out in Martinez v. Trani, the Supreme Court has never applied Doyle where a defendant expressly waived his Miranda rights, as Mr. White did here. Well, you expressly waived those rights. I don't see ever that this defendant expressly waived his Miranda rights. I take it, to do that, you have to say, I waived my Miranda rights. Well, Your Honor, Mr. White signed a Miranda waiver form at the beginning of the interview, and in fact, not only that, but repeatedly throughout the course of the interview. But then he invoked it after that. He never specifically invoked it. Well, he didn't invoke the word Miranda, but he said, I'm not going to say anymore. Your Honor, Mr. White did not clearly, first of all, the interview didn't end when Mr. White said he wasn't going to say anymore. The interview ended when Detective Miller was trying to press Mr. White to give him names of people who were involved, which he hadn't been willing to do throughout the interview. And Mr. White said, I wish I could be a snitch, but I can't, so I'm not going to give you the names. Detective Miller ended the interview. And actually, at two prior... So you think the only time he asserted a right not to talk was in giving the names of snitches, and then he did not assert that as a Miranda right, but rather out of a fear that it could hurt him. Not even him. Yes, that it could hurt him because he would be labeled a snitch and because he was protecting other people. But those are not reasons to invoke a Miranda. That's not an invocation of Miranda. And he never invoked Miranda over the course of the 46-minute interview. There are two prior times where Detective Miller actually is about to stand up and leave and says, I'm going to give you an opportunity to decide if there's anything else you want to say. And Mr. White continues talking before he can even stand up to leave. So this is a defendant who repeatedly throughout the interview also said, I know that I didn't have to talk to you, and I wasn't going to say anything. But based on your attitude and your approach to the interview, I decided to speak with you. But let's go back to where the government, I think, potentially did violate Pemberton. And that would have been in the government's closing argument, where the government said that the defendant refused to give this answer. Wouldn't he have done so? I think other times, maybe it's a little less clear whether the government violated Pemberton. But it's hard to say that they didn't violate it in the closing argument, where the government said, well, he didn't say this. And the implication is, if he were innocent, he would have given that other answer. How do you, does this focus on the government's use in the closing argument? Absolutely, Your Honor. And I want to focus on that specific part right at the end of closing. Before I do, if I could just briefly finish answering Judge Rossman's question about the two-step inquiry. Of course. After he's waived his Miranda rights, then he's got to rely on this court's partial silence cases. That derives from the Herald decision. And Herald is very clear in its language. It carves out a narrow exception to the Anderson rule that says that to an extent that a defendant clearly relies on a Miranda warning to refuse to answer specific questions, then he can invoke Doyle. And Canterbury and May, in discussing partial silence, not only cite to Herald, they cite to the specific footnote of Herald that includes the language that I just quoted. So those decisions are consistent that a defendant does, if he's going to waive, then he later needs to invoke his right before he can claim partial silence. Now, as to the government's closing argument, the government, a number of the instances that Mr. White highlights as comments on supposed silence are actually comments on inconsistent omissions. As we've pointed out, Mr. White said that he had given a complete story. And so anything that he said, that he omitted that was material, was directly inconsistent with that statement. And Mr. White, throughout the course of the case. You're relying on that statement. He didn't say I gave you the complete story. He said I gave you about 90% of the complete story. Well, he said both. At one point, he said I told you from start to finish why I'm here. At another point, he said 90 to 95%. Yeah, I don't think that those are inconsistent. I think I told you why I was here is more of a general statement I'm going to talk. But then I think he's specifically saying, there's part of it I didn't tell you. And I think it can be implied that that part was because of Miranda. And the government said, wouldn't he have told you those things if that would have helped his case and if it was true? Well, what he didn't tell Detective Miller, and you can see this in the interview, is the names of the people who were involved. We're not talking about the names of the people, no. I think that in the closing argument, the government is talking about his inconsistent stories about how he got the gun. So, Your Honor, the government repeatedly made the argument. A number of statements that Mr. White highlights goes to this. The government repeatedly made the argument that Mr. White had told Detective Miller, he had made repeated statements throughout the interview suggesting that he had, in fact, possessed a gun, not only on the day in question, but for months since then. Since he was shot earlier, he said on New Year's Eve. He said, I got shot. Do you really think that someone who got shot is not going to have a gun, whether he's supposed to or not? He repeatedly said that he wasn't going to let anyone shoot him, even if it meant that he had to go to prison. He said that before he got shot, he didn't possess a gun. But after he got shot, it changed everything for him. Now, the government argued in trial, after Mr. White testified on direct examination, that he didn't tell Detective Miller the story he testified at trial. Instead, he told a different story. He testified that he was hesitant to talk to Detective Miller because he didn't trust him. And he thought Detective Miller was only going to use whatever he said to incriminate him. Now, part of how the government responded to that was by highlighting that Detective Miller had, in fact, given him a full and fair opportunity to say what he wanted and wasn't dead set on proving his guilt. But another important way that the government addressed that argument was to say, it doesn't make sense that he gave that explanation for why he wouldn't tell Detective Miller the story he told at trial instead of the story he told before. Because he said things that were obviously incriminating. These statements about possessing a gun for months, whether he's allowed to or not, are obviously incriminating. And it wouldn't make sense for him to say that, but then to withhold details that would have been exculpatory. So right before the part of the closing argument that my friend on the other side quoted, the government is making that very argument. The government says, ladies and gentlemen, Mr. Burdick, the defense counsel, told you, well, he doesn't want to tell Mr. Miller everything. He doesn't trust him. Then why say things to Detective Miller that are more incriminating on their face, suggesting that maybe he was involved in something, but they weren't the aggressor? These statements about, since January, I need to protect myself, what would you do? Wouldn't you possess a firearm? Those statements are more incriminating than what he told you today. And if what he told you today was the truth, there is zero, no downside to telling Detective Miller that. So that is a comment on the inconsistency between the statements that he gave to Detective Miller and the statements that he gave at trial, and that is rebutting his explanation for why he didn't tell Detective Miller what he had said at trial. The government needs to be able to do that to address the question of inconsistent statements. That's not a Doyle violation. It's asking a jury to draw inferences. It's probing the trial evidence. That's Anderson, that's May, and that's this case. Let me ask you something about the signature on the Miranda warning sheet. There are two things I've seen on those sheets. One is, I acknowledge that I received these warnings. There's another that sometimes is there saying, and I waive my rights. Did he say both things, or one of those, or which one in this case? Because you said it was a waiver, and often what you sign isn't a waiver. It's an acknowledgment that you were warned. The record is somewhat unclear as to what exactly he signed. It's not in the record. The document's not in the record? The document's not in the record. What is clear is that he initialed the part of the form that said that he understood that he had the right to remain silent, and then he signed at the bottom of the form. And again, we're not just relying on the Miranda waiver form. We're also relying on the fact that he said repeatedly throughout the interview, I wasn't going to say anything, but based on your approach to this, I'm talking to you. And he never invoked his Miranda rights clearly, as Herald requires, or really in any way. The statement that is highlighted about it is, Herald requires after there has been a waiver. Right, right. And I thought you were relying on this document as a waiver, but that's iffy. Well, we do think that he waived at the beginning of the interview by signing the document. And then after he signs the document, the detective begins asking him questions and says, where do you live? And Mr. White says, well, I'd rather you ask me a real question. And then only once the detective says, OK, well, what happened out there today, does Mr. White begin to talk to him. So that's clearly waiving his right to silence. And that's reflected throughout the interview in his statements about knowing that he didn't have to talk and deciding to do so. Are you asking us to import some sort of Fifth Amendment reasoning into a due process context, or are you suggesting that it already exists? It already exists, and it already comes directly. And is it Herald? It's Herald. That's right. And Herald is very clear in its language. Does Herald talk about the Fifth Amendment? Herald in, I'm sorry, the defendant in Herald himself did use the phrase Fifth Amendment, yes. And what this court said in Herald is he has to clearly rely on his Miranda rights to refuse to answer specific questions. Mr. White has never really addressed that language from Herald, but that is still good law. It's cited in May and Canterbury. And I think May is important to highlight, because the level of inconsistency that we're dealing with here is far greater than what this court addressed in May. In May, the defendant told police after his arrest that he had given his co-defendant money to buy drugs to sell because she needed it, but only at trial did he claim that he subsequently withdrew from the conspiracy and then participated again only because he believed her life was otherwise in danger. Now, there's nothing directly or necessarily inconsistent about those two stories, but they're at least arguably inconsistent because they imply different motives. Just like in Pemberton, there was at least an arguably inconsistency. And that's sufficient under the language of May. As May says, a Doyle violation can be found only if the prosecutor's comments in context were manifestly intended to be a comment on the defendant's exercise of his right to remain silent or would naturally and necessarily be understood as such. That's a very high standard, and it's even higher when we're here on plain error review. And I just want to point out that the contradiction here that we have is much more direct than in May. We have two fundamentally different stories. In the first instance, it was, this all started when I was shot on New Year's Eve. Ever since, these people have been harassing me every single day. I see them every day. I saw them again today. They shot at me. And I'm not going to tell you their names, but we definitely wasn't the aggressors. In the second version of the story, it's, I was alone, and I have no idea who shot. I don't even know if they were shooting at me. I was carjacked. I never saw anybody. I never even looked in their direction. Those are two fundamentally different stories. And in probing the differences between those two stories, the government needs to be able to ask questions and to ask the jury to draw inferences about why Mr. White would tell a different story the first time and not the second time. That includes- Once you get that the stories are inconsistent, can the government then ask for, why did you not say something else? Can the government then ask about inconsistencies because of an omission? Or can, clearly the government can ask, the affirmative statements you made before are inconsistent with the affirmative statements you can make now. But can the government say, the omissions that you didn't testify about before are inconsistent with what you said now? Yes, Your Honor. And that's clear in the Supreme Court's decision in Anderson as well as in May. The government can ask about inconsistent omissions as well as inconsistent statements. The Supreme Court said in Anderson, anytime you tell a story, you're of course omitting a different story. But we're not going to adopt a formalistic understanding of silence that would say that you can ask about one, but not the other. And that's precisely what Mr. White is asking this court to do, to say the government could highlight, for example, his statement to Detective Miller that we definitely wasn't the aggressor, but couldn't ask him why he didn't tell Detective Miller that he was alone. That's the formalistic understanding of silence that Anderson rejected and that this court should reject here. And if I could particularly just, I know I'm out of time, but just to highlight the point with one point about what he testified at trial. He testified at trial that his statements about not letting someone kill him were because what I meant was I picked up the gun to run to not be shot. And his opening brief argues the jury could accept that. But immediately after that, the next question the government asked was, and Detective Miller gave you every opportunity to tell him what happened, correct? Now, the government is asking there, well, if that's what you were referring to, why didn't you say that? And the government needs to be able to ask a question like that. It needs to be able to highlight the inconsistent omissions, as well as the inconsistent statements, as part of probing the facts at trial. Thank you. Thank you, Your Honors. Your time has expired. Thank you very much. Excellent arguments. Counselor excused. Case is submitted. We're now going to take a, well, maybe a little longer break. I'm going to ask my clerks to put the baklava for our guests.